Date signed March 25, 2013



DUNCAN W. KEIR
U. S. BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | : | |
| Kathy Gordon, | : | **Case No. 10-30522** |
| | | **Chapter 7** |
| Debtor. | : | |
| ------------------------------------------------- | | |
| Bruce Fleming, | : | |
| Plaintiff, | : | **Adversary Proc. No. 10-941** |
| v. | : | |
| Kathy Gordon, | : | |
| Defendant. | : | |
| ------------------------------------------------- | | |
| Jessie Fleming, | : | |
| Plaintiff, | : | **Adversary No. 10-942** |
| | | **(Jointly Administered Under** |
| v. | : | **Adversary No. 10-941)** |
| Kathy Gordon, | : | |
| Defendant. | : | |

<u>**MEMORANDUM OPINION**</u>

Before the Court are two adversary proceedings commenced separately by

Plaintiff Dr. Bruce Fleming (hereafter referred to as "B. Fleming") and Plaintiff Dr. Jessie Fleming (hereafter referred to as "J. Fleming")(together, the "Plaintiffs"),[1] by the filing of Complaints to Determine and Objecting to Dischargeability of Debt (the "Complaints"). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Local Rule 402 of the United States District Court for the District of Maryland. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(1).

## I. Procedural Background

The Adversary Proceedings were filed seeking a finding of non-dischargeability pursuant to Sections 523(a)(2), (4), (6) and (19) of the Bankruptcy Code. At the conclusion of discovery, Plaintiffs filed for summary judgment on all counts. The Court held a hearing on the Plaintiffs' Motion for Summary Judgment on April 24, 2012.

The Court found that material disputes of fact existed as to the § 523(a)(2) and (4) counts and summary judgment could not be granted in favor of Plaintiffs. Further, Plaintiffs conceded that the facts did not support a finding of willful and malicious injury under § 523(a)(6). The Court thereupon granted summary judgment to the Defendant as to the counts brought under § 523(a)(6). With respect to the § 523(a)(19)[2] counts, the Plaintiffs

---

[1] The adversary proceedings were combined by an Order To Jointly Administer Adversary Proceedings entered on March 29, 2011. Plaintiff J. Fleming is the mother of Plaintiff B. Fleming.

[2] Section 523(a)(19) excepts from discharge a debt that
(A) is for—
      (i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or
      (ii) common law fraud, deceit, or manipulation in

sought a finding of non-dischargeability of an award granted as part of a Consent Order in

an administrative proceeding before the Maryland Securities Commission by and between

the Securities Commission and Defendant.  The Consent Order agreed to by the Defendant

without admitting or denying guilt, recited that the Securities Commissioner found that

Defendant violated the securities and anti-fraud provisions of the Maryland Securities Act

by selling unregistered securities, and *inter alia*, failing to disclose certain risks to Plaintiffs.

Plaintiffs, along with two other clients of Defendant, received a combined award of $50,000

from the Securities Commissioner on December 12, 2008.  The Court found that this debt to

Plaintiffs, if unpaid would be non-dischargeable pursuant to § 523(a)(19).   However, at the

hearing on summary judgment, Counsel for Defendant informed the Court that Defendant

had paid the entire amount awarded to Plaintiffs by the Securities Commissioner.

Accordingly, the Court also awarded summary judgment in favor of the Defendant as to the

counts pled under § 523(a)(19).

The Court then conducted a two-day trial on October 9 and October 11, 2012

---

connection with the purchase or sale of any security; and
(B) results, before, on, or after the date on which the petition was filed, from—
    (I) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;
        (ii) any settlement agreement entered into by the debtor; or
        (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

11 U.S.C. 523(a)(19).  Thus, § 523(a)(19) allows for debts to found non-dischargeable if the acts of a financial planner violate federal or state securities law, or constitute fraud, deceit, or manipulation in connection with the purchase or sale of a security and there is an entered judgment in a federal or state court, or by an administrative proceeding, settlement, or consent order.

upon the remaining counts brought under §§523(a)(2) and (a)(4).[3]  At the conclusion of evidence, at the Court's request, all parties submitted proposed findings of facts and conclusions of law.

## II.  Factual Background

Defendant is a certified financial planner with twenty-three years of experience in the financial industry, and is licensed to sell all types of securities, including bonds.  Both Plaintiffs were clients of Defendant.  Plaintiff J. Fleming first approached Defendant in 1992 for investment recommendations when changes were being made to J. Fleming's retirement and pension systems.  Plaintiff B. Fleming initially went to Defendant to prepare his taxes, and later, as he began to receive money from his elderly father, approached Defendant for investment advice.

In 2004, Defendant approached both Plaintiffs with an investment opportunity in Pomfret Plantation, LLC ("Pomfret"), a Maryland limited liability company owned by Wills-Hatala, LLC and Gordon & Company LTD (the latter entity was owned wholly by the Defendant's son, Matthew Gordon).  The developers of the Pomfret project envisioned purchasing five tracts of land, measuring 520 acres, in Marion Station, Maryland and building a real-estate development.  When presenting the Pomfret opportunity to Plaintiffs, Defendant did not provide Plaintiffs with materials including a prospectus because according to Defendant, a prospectus was not required.[4]   B. Fleming testified that he did not

---

[3] The Transcripts of the October 9 and October 11, 2012 trial are part of the Court's record and appear at docket Nos. 59 and 60, respectively.

[4] Transcript, October 9, 2012, p. 45, lines 1-5.

request further information because that was not the type of relationship he had with Defendant. B. Fleming testified, "Whatever she told me to sign, I signed. . . . [5] I didn't ask because I assumed she was doing the right thing for me."[6]

To raise funds for the project, Pomfret planned to sell Notes to be secured by the acreage owned by Pomfret. When an individual invested in the Pomfret project, he or she was provided a packet that included a "Bill Obligatory"[7] (hereinafter "Bill" or "Note") that stated that the Bill was "secured by real property. . . known as Pomfret Plantation."[8]

Based upon the Defendant's assurance that the Pomfret project was a good fit for the Plaintiffs' respective investment portfolios,[9] Plaintiffs invested in the project with B. Fleming investing $400,000 and J. Fleming investing $100,000. Defendant informed Plaintiffs that the "worst case scenario" was "the land would be sold and the notes repaid [in full]."[10]

On May 22, 2006, after expending $692,000 in owners' capital and $525,000 of

---

[5] *Id.* at p.61, lines 23-24.

[6] *Id.* at p.62, lines 4-5.

[7] A Bill Obligatory is a seldom used and perhaps archaic term for a promissory note. *C.f. Hand v. Mfrs. & Traders Trust Co.*, 405 Md. 375 (Md. 2008).

[8] Plaintiffs' Exhibit No. 3.

[9] Defendant testified that she would not have recommended the investment in Pomfret to Plaintiffs if she did not think the investment was a good fit for each of the Plaintiffs' respective portfolio and if she did not believe the Pomfret project fit within the category of moderate risk tolerance. Transcript October 9, 2012, p. 15-16, lines 24-25 and 1-4. But Defendant conceded that she was not privy to a large amount of information regarding the workings of Pomfret including its financials, capital contributions, and working capital. *Id.* at p.21, lines 13, 20-25; p.22, lines 1-4.

[10] Transcript, October 11, 2012, p.93, lines 22-25.

borrowed funds over the course of three years, Pomfret filed for bankruptcy relief in this Court under Chapter 11.[11]  Plaintiffs then came to learn that notwithstanding what they had been told by Defendant, the purchased Notes were not secured.  Following an order granting relief from the automatic stay, all real estate owned by Pomfret was sold at auction by the actual secured creditors and there was no surplus available for other creditors, including Plaintiffs.   The Chapter 11 was ultimately dismissed by the Court on May 17, 2007.  Neither of the Plaintiffs' loans to Pomfret were repaid.

### III.  Analysis

Plaintiffs assert that the difference between the amount received in payment of the award by the Maryland Securities Commissioner and the amounts set forth in the Plaintiffs' proofs of claims[12] filed in the Defendant's bankruptcy case, are debts that are non-dischargeable under either § 523(a)(4)[13] or § 523(a)(2).  Such a determination would permit Plaintiffs to seek to recoup their investment losses from the Defendant.  The exceptions to discharge enumerated in § 523 are construed narrowly in order to "protect the purpose of [the Bankruptcy Code of] providing debtors a fresh start." *Nunnery v. Rountree (In re*

---

[11] Case No. 06-12930-DK.

[12] J. Fleming filed Proof of Claim 1-1 asserting a claim of $155,684.93.  B. Fleming filed Proof of Claim No. 4-1 for $621,534.26.  On Schedule F, Defendant listed J. Fleming as holding a $150,134.00 tort claim and B. Fleming as holding a $626,741.00 tort claim.

[13] At the close of trial, both parties were instructed to submit proposed findings of fact and conclusions of law.  Plaintiffs filed proposed findings or conclusions in support of a finding of non-dischargeability under § 523(a)(2) but submitted no proposed findings or conclusions in support of non-dischargeability under § 523(a)(4).  However, because the counts brought under § 523(a)(4) have not been formally withdrawn, the Court will address those counts as part of this Memorandum Opinion.

*Rountree)*, 478 F.3d 215, 219 (4th Cir. Va. 2007)(citing *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. Va. 1999)).

**A. 11 U.S.C. § 523(a)(4)**

Section 523(a)(4)[14] excepts from discharge any debt for fraud or defalcation while acting in a fiduciary capacity.   In order to prevail on a claim falling under § 523(a)(4), a plaintiff alleging fiduciary defalcation or fraud must show:

> (1) the establishment of an express trust regarding the funds;
> (2) that the debtor acted in a fiduciary capacity; and
> (3) the debt is based upon the debtor's fraud or defalcation while acting as a fiduciary.

*Pahlavi v. Ansari (In re Ansari)*, 113 F.3d 17, 20 (4th Cir. 1997).  These elements must be proven by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.ed.2d 755, 767 (1990).

In order to prevail on a claim arising under § 523(a)(4) asserting defalcation, a defendant and plaintiff must have had a fiduciary relationship that is traditionally recognized by courts.  In *Heilman,* this Court explained, "The types of fiduciary capacity intended by Congress to render a debt non-dischargeable are persons in positions of ultimate trust, such as public officers, executors, administrators, guardians, trustees of express trusts, attorneys and corporate directors." *Spinoso v. Heilman (In re Heilman),* 241 B.R. at 169 (Bankr. D. Md. 1999).  *Accord Ohio Co. v. Maynard (In re Maynard),* 153 B.R. 933, 935 (Bankr. M.D. Fla. 1993) (The term fiduciary is generally narrowly construed, and this is especially so in

---

[14] Section 523(a)(4) provides: A discharge under section 727. . . of this title does not discharge an individual from any debt--
(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

the bankruptcy context).  However, not all relationships of reliance rise to the degree of trust required for a finding of defalcation. The *Heilman* Court explained,  "If the applicable non-bankruptcy law does not clearly and expressly impose trust-like obligations on a party, the court will not assume that such duties exist and will not find that there was a fiduciary relationship." *Heilman,* 241 B.R. at 169 (Bankr. D. Md. 1999)(cited in *Lottery Comm'n v. Wells (In re Wells)*, 431 B.R. 379, 382 (Bankr. E.D.N.C. 2009)).

Once the requisite relationship is established, the United States Court of Appeals for the Fourth Circuit has found that no intentional wrongful conduct must be proven by a plaintiff.  Rather, "negligence or even an innocent mistake which results in misappropriation or failure to account is sufficient." *Republic of Rwanda v. Uwimana (In re Uwimana),* 274 F.3d 806, 811 (4th Cir. 2001).  *See also Counsell v. Colfack (In re Colfack)*, 393 B.R. 222, 230 (Bankr. D. Neb. 2008) (The Eighth Circuit has held that a court can find a "defalcation" under § 523(a)(4) without evidence of bad faith, intentional fraud, or other intentional wrongdoing); *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1187 (9th Cir. 1996) (An individual may be liable for defalcation without having the intent to defraud.).  *Contra Rutanen v. Baylis (In re Baylis),* 313 F.3d 9, 18-19, 22 (1st Cir. Mass. 2002) *(*For an act to fall under the "defalcation" exception to discharge, it must be a serious one indeed, and some fault must be involved."); *Spinoso v. Heilman (In re Heilman),* 241 B.R. 137, 170 n.31 (Bankr. D. Md. 1999)("Mere negligence on the part of a trustee of an express trust in the absence of intentional wrongdoing . . . does not constitute defalcation within the meaning of 11 U.S.C..S. § 523(a)(4).")

If the asserted fiduciary relationship is one of a trustee,[15] then plaintiff must also prove the existence of an express trust. *In re Holmes*, 117 B.R. 848, 852 (Bankr. D. Md. 1990); *In re Piercy*, 140 B.R. 108, 114 (Bankr. D. Md. 1992). An express or technical trust is a formal fiduciary relationship whose creation is based upon the intentions of a settlor and/or a beneficiary. *Holmes*, 117 B.R. at 852. When evaluating the alleged existence of an express trust, courts, above all else, look for a manifestation of intent by one party to confer on another equitable duties to act. *Kubota Tractor Corp. v. Strack (In re Strack),* 524 F.3d 493 (4th Cir. Va. 2008); *Christian v. William R. Justice, d.b.a. W. R. Justice and Associates (In re Case No. 01-50091)*, 2002 Bankr. LEXIS 1540 (Bankr. S.D. Ohio Dec. 23, 2002). Even more than the word "trust" itself, courts look to the intentions of the parties. *Strack,* 524 F.3d at 498. The *Strack* court opined that "All that is necessary is the 'unequivocal' intent 'that the legal estate [be] vested in one person, to be held in some manner . . . on behalf of another. *Id.*

The Defendant's job was described in various ways during trial as well as in the pleadings: financial advisor, broker-dealer, investment advisor.[16] Cases have found that a fiduciary relationship generally exists between a broker-dealer agent and a customer. *See Nevels v. Caples (In re Caples),* 454 B.R. 191, 199 (Bankr. N.D. Ala. 2011)(An Alabama

---

[15] Black's Law Dictionary defines "trustee" as "one who stands in a fiduciary or confidential relation to another; esp., one who, having legal title to property, holds it in trust for the benefit of another and owes a fiduciary duty to that beneficiary." Black's Law Dictionary (9th ed. 2009).

[16] Transcript, October 11, 2012, p.52, line 11 (financial advisor); Complaint, Docket no. 1 (investment advisor); Plaintiffs' Post-Trial Memorandum, Docket no. 51 (investment-advisor); Defendant's Post-Trial Memorandum, Docket no. 56 (investment advisor); Transcript, October 11, 2012, p.77, lines 13-15 (broker/dealer).

federal district court recognized that where a broker-dealer is also an investment advisor the broker does occupy a fiduciary relationship with the customer.); *Lutz v. Chitwood (In re Donahue Sec., Inc.)*, 318 B.R. 667, 673 (Bankr. S.D. Ohio 2004) (Equally well-worn is the concept that broker-dealers are subject to common law duties, and in some instances . . . fiduciary obligations to their customers.").  However, the evidence in this case clearly indicates that the Defendant was acting as a financial or investment advisor to Plaintiffs.[17]

In the Complaints, Plaintiffs allege that because Defendant was the Plaintiffs' financial and investment advisor, Defendant was in a position of "trust" and "confidence" and used this position in order to solicit, through fraud and defalcation, investment funds from Plaintiffs.[18]  However, neither of the Plaintiffs' testimony at trial demonstrated an intention to grant unfettered authority to Defendant in terms of investment choices or control of the Plaintiffs' funds.  To that end, J. Fleming testified that when Defendant first approached her about investing in Pomfret, Defendant asked if Plaintiff would "be willing to invest $200,000."[19]  J. Fleming further testified that she told Defendant she did not want to invest that much, but agreed when Defendant asked if she would be willing to invest $100,000.[20]  J. Fleming's testimony is revealing twofold.  First, Defendant was required to verify that J. Fleming was "willing" to invest in Pomfret, thus Defendant did not have the level of authority and control to make investment choices on behalf of Plaintiffs as she

---

[17] For example, B. Fleming described the Defendant as his financial advisor. Transcript, October 9, 2012, p. 49, line 22.

[18] Complaint, Docket No. 1, p. 6.

[19] Transcript, October 9, 2012, p. 77, line 11.

[20] *Id.* at p.77, lines 12-13

would were an express trust in place. This is bolstered by J. Fleming's later testimony that she thought she held discretionary accounts[21] with Defendant, but acknowledged "[e]ach time she was going to change my investments she always told me about it and we discussed it."[22] Second, J. Fleming's disagreement with a suggestion made by Defendant shows that J. Fleming did not blindly follow the Defendant's recommendations notwithstanding her testimony that she gave Defendant her "complete trust."[23]

Similarly, although B. Fleming testified that he believed that Defendant had authority to invest money without his prior specific consent, the arrangement he described does not fit one where the financial planner has autonomy over investments. B. Fleming acknowledged that the Defendant had to discuss investments when making investment recommendations.[24] He repeatedly referred to the Defendant's investment advice as "recommendations" while also stating that whatever she suggested, he would do.[25] Despite the testimony of both Plaintiffs that Defendant had absolute control over their investment accounts, the Court finds more credible that the Defendant's testimony that she did not hold discretionary accounts[26] on behalf of Plaintiffs. Consistent with that finding,

---

[21] The term discretionary account was used in the testimony of the parties to describe an investment account in the control of an investment professional that could be invested by the professional in her discretion without specific approval by a client.

[22] Transcript, October 9, 2012, p.84, lines 9-10.

[23] *Id.* at p. 77, line 1.

[24] Transcript, October 9, 2012, p. 61, line 25- page 62, line 4.

[25] *See e*.g.,. *Id.* at p. 52, lines 8-11.

[26] Transcript, October 11, 2012, p. 54, line 5.

B. Fleming testified that while he could not remember with absolute certainty, he believed

he had made out the checks to be paid to the order of Pomfret and not to Defendant herself.[27]

Therefore, while Defendant had control over the physical checks, it is unlikely she had any

control over the funds themselves.  The Court concludes that Plaintiffs have failed to meet

their burden in establishing that a fiduciary relationship existed among Plaintiffs and

Defendant, to the extent required for a finding of defalcation under § 523(a)(4).

Plaintiffs also cannot successfully state a claim under the other provisions of §

523(a)(4) because they have failed to plead or prove embezzlement or larceny.   Under §

523(a)(4) embezzlement has been defined as "the fraudulent appropriation of property by a

person to whom such property has been entrusted or into whose hands it has lawfully come."

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996); *Brown v. Beckett

(In re Beckett)*, 96 B.R. 266, 268 (M.D. Fl. 1989). Plaintiffs have not submitted facts that

would support a claim of embezzlement because they have not submitted any facts that

suggest  Defendant misappropriated  funds.  Rather, Plaintiffs concede Defendant invested

the Plaintiffs' monies in the Pomfret project as directed.

As to larceny, federal common law and federal practice define larceny as a

"felonious taking of another's property with intent to convert or deprive the owner of the

same." *In re Davis,* 262 B.R. 663, 672 (Bankr. E.D. Va. 2001); *In re Lynch*, 315 B.R. 173.

*Accord  In re Zanetti-Gierke*, 212 B.R. 375 (Bankr. D. Kan. 1997).  Plaintiffs have neither

asserted, nor presented any evidence of a larcenous taking by Defendant.

Thus, the Court finds and concludes that the Plaintiffs' debts shall not be excepted

---

[27] Transcript, October 9, 2012, p. 64, lines 23-24.

from discharge under § 523(a)(4).

**B. 11 U.S.C. 523(a)(2)**

Plaintiffs also allege that the debts owed them by Plaintiff must be found non-dischargeable pursuant to § 523(a)(2)(A).   This section provides that debts "for money, property, services" are non-dischargeable "to the extent obtained, by - false pretenses, a false representation, or actual fraud."[28]  A misrepresentation can be any words or conduct which produce a false or misleading impression of fact in the mind of another. *Pleasants*, 231 B.R. at 897.  An omission may constitute a misrepresentation where the circumstances are such that a failure to speak or act creates a false impression.  *Id.*

To sustain an action under § 523(a)(2)(A) a plaintiff must satisfy five elements by a preponderance of the evidence.  *Garner,* 498 U.S. at 291, 111 S. Ct. at 661, 112 L. Ed. 2d at 767 (1991); *In re Rountree*, 478 F.3d 215, 218 (4th Cir. 2007); *In re Koep*, 334 B.R. 364, 371-72 (Bankr. D. Md. 2005); *In re Pleasants*, 231 B.R. 893, 897 (Bankr. E.D. Va. 1999), *aff'd,* 219 F.3d 372 (4th Cir. 2000).  To successfully prosecute a § 523(a)(2)(A) claim, a Plaintiff must prove:

> 1.  That a representation was made by the defendant;
> 2. That the defendant knew that the representation was false when she made it;
> 3. That the defendant made the representation with the intent and purpose of deceiving the plaintiff;

---

[28] Section 523(a)(2)(A) provides:
(a) A discharge under § 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

4. That the plaintiff justifiably relied on the false representation; and
5. That plaintiff suffered damages as a proximate result of the representation.

*Koep*, 334 B.R. at 372; *In re Biondo*, 180 F.3d 126 (1999); *In re Valdes*, 188 B.R. 533 (Md. 1995). While the underlying validity of a creditor's claim is determined by state law, the issue of non-dischargeability is a matter of federal law governed by the Bankruptcy Code. *Garner*, 498 U.S. at 283, 111 S. Ct. at 657, 112 L. Ed. 2d at 763 (1991) (citing to *Brown v. Felsen*, 442 U.S. 127, 129-130, 99 S. Ct. 2205, 60 L. Ed. 2d 767 (1979)).

The requirement of a knowing false representation can be satisfied by a reckless representation. A representation is "reckless" if it is made without any knowledge of the truth, if the person making the representation knows that he does not have sufficient information or a basis to support it, or if he realizes that he does not know whether or not the statement is true. 37 Am Jur 2d Fraud and Deceit § 120. *See e.g. Livingston Livestock Exchange, Inc. v. Hull State Bank*, 14 S.W.3d 849 (Tex. App. Beaumont 2000); *Foiles v. Midwest Street Rod Ass'n of Omaha, Inc.*, 254 Neb. 552, 578 N.W.2d 418 (1998); *Ausley v. Bishop*, 133 N.C. App. 210, 515 S.E.2d 72 (1999). Simply stated, a representation is made recklessly when the speaker has no regard for whether it is true or false. *Accord In re Lindsley,* 388 B.R. 661, 669 (Bankr. D. Md. 2008) (citing *Pleasants*, 231 B.R. at 898).

Intent to deceive may be inferred if defendant knowingly or recklessly made false representations, which he should have know would induce another to rely on them. *Pleasants at 898. T&T Universal Card Servs. Corp. v. Trivisani (In re Trivisani)*, 225 B.R. 319, 321 (Bankr. D. Md. 1998) (citing *Citibank, N.A. v. Michel,* 220 B.R. 603, 606 (N.D. Ill. 1998)). *See also In re Falk of Bethlehem*, 3 BR 266, 275 (Bankr. D.N.J. 1980) (the ultimate facts required to make a determination of intent must often be inferred because they involve

a conclusion as to the state of mind of the maker); *Cafini v. Matera (In Re Matera)*, 592
F.2d 378, 380 (1976) (the questions of knowing and reckless falsehood and intent are
questions of fact).

Here, Plaintiffs aver that Defendant explicitly misrepresented pertinent information
regarding the Pomfret project, and also misrepresented by omission that the Pomfret
investment was within each of the Plaintiffs' respective investment portfolios.[29] Plaintiffs
contend that Defendant knew or should have known, that the Pomfret project was too
speculative to fall within the risk tolerance of each Plaintiff.

First, Plaintiffs argue that Defendant misrepresented the risk of the Pomfret
investment by commission. Plaintiffs focus on the fact that Defendant informed Plaintiffs
the Bills were secured. Defendant concedes that she did in fact inform each Plaintiff the
Bills would be secured, but that was because she believed that to be the case[30] and that
Pomfret was a "low risk"[31] investment where the "worst case scenario" would be that the
land would be sold and the Plaintiffs would be fully repaid for the investment from the sale.
As noted *supra*, Defendant believed the Notes were secure because the Notes themselves
contained language asserting they were secure.[32] Counsel for Pomfret had drawn up the
"Bill Obligatory" to be given to investors that stated the Bill was "secured by real property .
. . known as Pomfret Plantation."[33] Plaintiffs challenged the representation by Defendant

---

[29] Transcript, October 9, 2012, p. 77, lines 16-18.

[30] *Id.* at p.36, lines 6-11.

[31] *Id.* at p. 30, limes 13-15.

[32] Transcript, October 11, 2012, p.65, line 17.

[33] Plaintiffs' Exhibit 3.

that she believed the Notes were secured and argued in the alternative that her belief was

without credible foundation and that her representation of security was reckless.

> Counsel:  Now, at the time you made that statement, that was not true, was it?

> Defendant: I have no idea. At the time I thought it was true.

> Counsel: All right. Now, at the time, you made that statement, Pomfret Plantation didn't even own the real estate, in October of 2004.

> Defendant: They were already under contract.

> Counsel: You understand the difference between something under contract and actual ownership?

> Defendant: It was

> The Court: Well, it depends upon if you're talking about legal ownership or equitable ownership under the laws of Maryland when you use that term, counsel and you didn't define it. You want to define it?

> Counsel: I do.

> The Court: All right.

> Counsel: In terms of giving them a mortgage as a part of where their money [sic], how could Pomfret Plantation do that if they didn't have legal title to the property at the time of the investment, do you know?

> Defendant: Well, my understanding is on an installment sale that they do in all terms of management and ownership and legalities own the property. They just don't have the deed until the final closing which had been determined that it would be in December.

Transcript, October 9, 2012, p.36 lines-12-25, p.37 lines 1-10.

The Court finds that it cannot infer that Defendant could not have believed the

statement in the Notes that the Notes were secured because Deeds to the Pomfret property

had not been received by Pomfret at the time the Notes were exhibited to the Plaintiffs.  No

definitive information as to the type of contract(s) to purchase by and between Pomfret and

- 16 -

the seller of the land was placed in evidence.  The Court makes no finding that the

contract(s) were retail installment contracts.  However, under the doctrine of after acquired

title:

> In equity, however, a mortgage which in terms covers things thereafter to be
> acquired creates a lien or charge on such things, upon their acquisition by the
> mortgagor, this being an application of a general equitable principle that if
> one, by contract, undertakes to create a lien or charge, the lien or charge will
> be regarded as actually existing, upon the acquisition by such person of the
> thing sought to be charged, unless the mortgage is, by its terms, restricted to
> the interest held by the mortgagor at the time of its execution.

5 Tiffany, Real Prop., § 1385 (2012 ed.)(citations omitted).   It therefore appears that the

statement as to being secured, contained in the Notes was not a legal impossibility, even if

this Court were to charge the lay Defendant with having knowledge of applicable real estate

law.

The Court finds that the Defendant's representation that the Bills were secured was

not a known falsehood but rather Defendant believed the Bills were secured as stated

therein.  Nor was the Defendant's belief, based upon a document prepared by counsel for

Pomfret, reckless as a legal replacement for a knowing falsehood.[34]

In the alternative, Plaintiffs argue that Defendant did not have sufficient information

regarding Pomfret to make an informed recommendation to Plaintiffs, and thus in

recommending the project she did so recklessly.  Plaintiffs contend that they would not have

invested if Defendant had properly advised them about the Pomfret project.  In turn,

Defendant testified that she concluded that Pomfret was financially sound after discussions

---

[34] Neither Plaintiffs nor Defendant called the drafting counsel as a witness and no
evidence was presented explaining why the statement as to security was included in the Bill
but not accomplished in fact.

with the real estate developers and other local real estate developers, an informal appraisal prepared by Bill McCain that valued the property at $5,000,000, and her examination of budget sheets and cash flow projections provided by Matthew Gordon.[35]

In their submission Plaintiffs cite to *In re Lindsley*, 388 B.R. at 661, for the legal proposition that words or conduct, including omissions which produce a false or misleading impression constitute a misrepresentation.  However, the facts in *Lindsley* are so divergent from the evidence before the Court in the instant case as to lend no weight to the court's application of the elements of § 523(a)(2) to this case.

An example of a "reckless" statement that could not be ruled out as not "reckless," on directed verdict, is found in *Livingston Livestock*.  In *Livingston Livestock,* the plaintiff bank customer brought suit against his bank alleging, *inter alia*, fraud based on the bank's actions in connection with a wire transfer.  The Court of Appeals of Texas, in finding that the lower court had erred in awarding a directed verdict in favor of the defendant on the fraud count, reasoned that defendant bank's vice-president, "[T]ook no steps to verify[] information before representing [] the [wire] transfer had occurred."  14 S.W.3d at 853.  The court explained that the failure of the bank's vice president to make an independent inquiry into whether a wire transfer had been successfully made in favor of the plaintiff, and simply repeating what had been told to her regarding the transfer, amounted to sufficient facts to survive a directed verdict and sufficiently supported plaintiff's allegations that a knowing misrepresentation had been made.  *Id.*

Here, as opposed to *Livingston Livestock*, the evidence presented at trial was that

---

[35] Transcript, October 9, 2012, p.32, lines 6-7 and 16-20.

Defendant took steps to investigate the Pomfret project and from the information received reasonably believed the Notes were secured and the investment was within the expressed risk tolerances of each Plaintiff. The Court finds the Defendant's testimony credible, and that Defendant did in fact believe that the Notes purchased by Plaintiffs would be secured by the land, and that the "worst case scenario" would be that the land was sold and Plaintiffs were reimbursed in full.

In evaluating the evidence, the Court must take judicial notice of the economic events in the years immediately leading up to the investment. In the years leading up to 2004 when Plaintiffs invested in Pomfret, real estate values had increased exponentially. However, beginning perhaps in 2007 and accelerating in 2008, real estate sales and development projects like Pomfret virtually crashed. The Court cannot impute to Defendant that in 2004 she should have known this crash would occur.

Both at trial and in the Post-Trial Memorandum, Plaintiffs vigorously assert that Defendant misrepresented her son, Matthew Gordon's, involvement in the Pomfret venture. Mr. Gordon's involvement does raise a concern as to a conflict of interest in the Defendant's investment advice. However, there was no misrepresentation by omission or commission of Matthew Gordon's involvement as both Plaintiffs conceded that they were informed by the Defendant of Matthew Gordon's involvement in the project when Defendant made the investment recommendation.[36] Plaintiffs also argue that Defendant had a duty to disclose that Matthew Gordon had filed a Chapter 7 bankruptcy case in 2004. In the Plaintiffs' Post-Trial Memorandum they argue that had they known of the financial condition of Matthew

---

[36] *Id.* at p. 77, line 22 (testimony of J. Fleming); *Id.* at p.59, line 14 (testimony of B. Fleming).

Gordon they would not have invested in Pomfret.  However, it was the financial prospects of Pomfret, not Matthew Gordon that were relevant to the alleged recklessness of the investment advice.  Matthew Gordon was an indirect part owner in Pomfret.  No evidence was introduced showing any representation or omission as to the project's success being linked to or dependent upon Matthew Gordon's personal financial history, including his bankruptcy discharge.

Nor does the Defendant's desire to aid her son in his business venture, standing alone, prove by a preponderance of the evidence that Defendant intended to deceive Plaintiffs in order to induce them to invest.  It is undisputed that Defendant wanted the venture to succeed.  However, the evidence was uncontradicted that the Defendant only became directly involved in the project after the Plaintiffs' investments in an effort to help keep the "program afloat."[37]

Plaintiffs not only focus on the specific representations made to them regarding the risk of the Pomfret investment, but also on the inferences from the Defendant's representations.  Specifically, Plaintiffs suggest that by recommending Pomfret, Defendant implied that the project was within each of the Plaintiffs' risk tolerance, when in fact they assert it was a riskier investment than those historically recommended by Defendant.  For instance, B. Fleming testified, "The fact that she said . . . Pomfret is the best place for my money.  Had to assume she had my best interest at heart and that was correct."[38]  Likewise J. Fleming testified that while she did not recall any discussion with Defendant about the risk

---

[37] *Id.* at p.36, line 3.

[38] *Id.* at p.58, lines 18-20

of the investment, "the inference was yes she thought it was a good deal for me and she thought should do it."[39]

The Court finds at trial that Plaintiffs downplayed their risk tolerance. Both Plaintiffs repeatedly testified that they were each low risk investors.[40] During the direct testimony of J. Fleming, the Court inquired if the $100,000 was substantially more than past investments and J. Fleming responded "Much more. Much more."[41] However, during the Defendant's case-in-chief, Defendant, testified that one of the first investments J. Fleming made through Defendant was with Petroleum Development Corporation, where she invested $100,000 and became a general partner in the oil and gas development program. Defendant testified that this sort of investment would fall on the high end of a moderate risk investment.[42] Additionally, Defendant testified that she believed J. Fleming had invested $300,000 in Confederation Life, $300,000 in Nuveen, and $420,000 in Manning Napier.[43]

B. Fleming completed an investment profile for Defendant in 2001 and it classified him as a "growth investor."[44] Defendant testified that she believed that this was too high of a risk profile and moved him down a level to a growth and income moderate investor.[45]

---

[39] *Id.* at p.77, line 16-18.

[40] B. Fleming: Transcript October 9, 2012, p. 51. lines 7-8. p.54, lines 15-21, p.66, lines 19-20,  p.73, lines 8-15; J. Fleming: *Id.* at p.82, lines 4-5, p.83, lines 18-22, p.76, lines 12-13 and 20-21.

[41] Transcript, October 9, 2012, p.83, lines 7-11.

[42] Transcript, October 11, 2012, p. 57, line 6.

[43] *Id.* at p.59, lines 15-19.

[44] *Id.* at p.10, lines 20-22.

[45] *Id.* at lines 22-24.

Additionally, the past investments of J. Fleming discussed by Defendant suggest a modest acceptance of risk. For instance, Defendant testified that she suggested J. Fleming sell a portion of her stock held in AT&T and other phone companies and place some of the proceeds in Pomfret because J. Fleming had previously expressed that she "wanted to sell the stocks, so to reposition the money to get more income."[46]   Regarding J. Fleming's investment in Petroleum Development Corporation, Defendant explained, "Jessie had different objectives for differing investments. . . [b]ut this one is a higher risk investment."[47]

The Court must conclude that Plaintiffs have not proven that the Defendant's actions constituted fraud under § 523(a)(2)(A). The Defendant's statements were not made recklessly, despite the fact they turned out to be untrue. Defendant performed independent due diligence before recommending the project to Plaintiffs. The Court believes that Defendant believed that Plaintiffs were making a secured investment, inline with their past investment portfolio.

Accordingly, the Defendant's debts will not be excepted from discharge under § 523(a)(2)(A).

### IV. Conclusion

As the above demonstrates there are differing levels of *mens rea* needed among the various subsections of § 523(a). As to § 523(a)(4), if a plaintiff proves a position of fiduciary capacity, then the breach of care is quite modest. *Uwimana*, 274 at 811. Where a defendant does not occupy a position tantamount to a trustee, debts arising at most from

---

[46] Transcript, October 11, 2012, p.92, lines 21-23.

[47] *Id.* at p.56, lines 7-10.

negligence, or breach of contract (here Defendant's duties to Plaintiffs appear to arise from a contractual relationship), are dischargeable. In contrast, when evaluating a defendant's conduct under § 523(a)(2)(A), a defendant need not be in a fiduciary relationship with a plaintiff, however, the defendant's conduct must be more egregious. Likewise, with claims pled under § 523(a)(6) (disposed of at summary judgment) a fiduciary capacity is not required, but a defendant's actions must be " wilful and malicious."

Further, Congress has also provided for the non-dischargeability of certain debts arising from securities violations, even if a debtor is not a trustee or a similar fiduciary under § 523(a)(4), nor has the requisite intent of either §§ 523(a)(2)(a) or (a)(6). Under § 523(a)(19) a debt that is for violation of securities laws, or fraud, deceit or manipulation in connection with the purchase or sale of any security is non-dischargeable if the acts result in a judgment, order or settlement agreement as described with specificity in § 523(a)(19).

However, Congress did not draft the reach of § 523(a)(2),(4),(6) and (19) to include all losses arising from investment advice by a financial advisor. Despite the Plaintiffs' attempts to utilize §§ 523(a)(2) and (a)(4) to recover the investment losses incurred by Plaintiffs that were not included in the Consent Order entered by the Securities Commissioner of Maryland, because Plaintiffs have not proven that the Defendant held the necessary position of trust required under § 523(a)(4) nor acted with the fraudulent conduct required by § 523(a)(2), the Court cannot find a basis in the Bankruptcy Code to find the Plaintiffs' losses non-dischargeable.

cc:
all parties
all counsel

**End of Decision**